**THE DLJ LAW FIRM, P.C.**
Dorian L. Jackson (Bar No. 269795)
3655 Torrance Boulevard, Suite 300
Torrance, CA  90503
Telephone: (310) 359-9203
Facsimile: (310) 359-9202
E-Mail: djackson@dljlawfirm.com

*Counsel for Plaintiffs and the Putative Class*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSICA LAGAFUAINA, KAILYN ROBERTSON, KHANH NGUYEN, MACHELLA GRAHAM, RABIA RAZAQ individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> MITCHELL INTERNATIONAL. INC., MITCHELL INTERNATIONAL, INC. 401(k) SAVINGS PLAN COMMITTEE, and JOHN DOES 1-10, <br><br> Defendants. | Case No.: **'25CV3018 DMS DDL** <br><br> **CLASS ACTION COMPLAINT** |

Plaintiffs Jessica Lagafuaina, Kailyn Robertson, Khanh Nguyen, Machella Graham, and Rabia Razaq ("Plaintiffs"), by and through their attorneys, on behalf of the Mitchell International, Inc. Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

---

[1] The Plan is a legal entity that can sue and be sued. *See* ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

CLASS ACTION COMPLAINT

1. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Mitchell International, Inc. ("Mitchell" or the "Company"), and the Mitchell International, Inc. 401(k) Savings Plan Committee ("Committee") and its members during the Class Period for breaches of their fiduciary duties.

2. The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Auditor's Report, attached to 2024 Form 5500 for the Plan, at 6 ("The Plan, which was adopted on April 1, 2000, and amended August 1, 2022 is a defined contribution plan[.] … The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA).").

3. To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. Dec. 30, 2016) (*en banc*).

4. The Department of Labor ("DOL") has also explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, "establish a prudent process for selecting investment options and service providers." *See also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("Tibble I") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5. Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of

CLASS ACTION COMPLAINT

trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[2]

7.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

8.      The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

9.      Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

---

[2] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

3
CLASS ACTION COMPLAINT

10. At all times during the Class Period, the Plan had at least one hundred million dollars in assets under management. At the Plan's fiscal year end in 2019, the Plan had $176,039,307 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2019 Form 5500 for the Plan, Schedule H, at 2.

11. By 2024, the Plan had $658,178,474 in assets under management. *See* 2023 Form 5500 for the Plan, Schedule H, at 2.

12. The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States. As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.

13. The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 1,945 participants. *See* 2019 Form 5500 for the Plan, at 2. By 2024, the Plan had 6,150 participants. *See* 2024 Form 5500 for the Plan, at 2.

14. Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a certain guaranteed investment fund with lower crediting rates when compared to available similar or identical investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

15. Specifically, Defendants allowed substantial assets in the Plan to be invested in a Guaranteed Income Fund ("Prudential[3] GIF"). The Prudential GIF carried significantly more risk and provided a significantly lower rate of return than other comparable stable value funds that Defendants could have made available to Plan participants.

16. Prudential benefited significantly from Plan participants being invested in the Prudential GIF. The assets invested in the Prudential GIF were held and invested by Prudential, which kept the spread (the difference between the amount Prudential earned on

---

[3] In 2023, Prudential Retirement Insurance and Annuity Company ("Prudential") became Empower Annuity Insurance Company. *See* Auditor's Report, attached to 2022 Form 5500 for the Plan, at 13 ("The Plan has a benefit-responsive investment contract with Empower Annuity Insurance Company.").

CLASS ACTION COMPLAINT

the investments and the amount Prudential paid to Plan participants). The crediting rates that Prudential provided to investors in the Prudential GIF were/are so low that Prudential reaped a windfall on the spread.

17. Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

18. Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II) and violation of ERISA's prohibited transactions (Count III).

## II. JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

20. This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

21. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III. PARTIES

### Plaintiffs

CLASS ACTION COMPLAINT

22.    Plaintiff, Jessica Lagafuaina ("Lagafuaina") resides in Lakewood, California. During her employment, Plaintiff Lagafuaina participated in the Plan. Ms. Lagafuaina invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential GIF.

23.    Plaintiff, Kailyn Robertson ("Robertson") resides in Stephens City, Virginia. During her employment, Plaintiff Robertson participated in the Plan. Ms. Robertson invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential GIF.

24.    Plaintiff, Khanh Nguyen ("Nguyen") resides in Garden Grove, California. During his employment, Plaintiff Nguyen participated in the Plan. Mr. Nguyen invested in the Prudential GIF in the Plan and suffered injury to his Plan account due to the significant underperformance of the Prudential GIF.

25.    Plaintiff, Machella Graham ("Graham") resides in Phoenix, Arizona. During her employment, Plaintiff Graham participated in the Plan. Ms. Graham invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential GIF.

26.    Plaintiff, Rabia Razaq ("Razaq") resides in Irvine, California. During her employment, Plaintiff Razaq participated in the Plan. Ms. Razaq invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential GIF.

27.    Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

CLASS ACTION COMPLAINT

28.    Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, and information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Moreover, having never managed a large 401(k) plan such as the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.

**Defendants**

**Company Defendant**

29.    Mitchell International, Inc. is the Plan sponsor and a named fiduciary with a principal place of business at 9771 Clairemont Mesa Boulevard, San Diego, California. *See* 2024 Form 5500 of the Plan, at 1. Mitchell delivers smart technology solutions and services to the auto insurance, collision repair, disability and workers' compensation markets. *See* https://www.vehicleservicepros.com/home/company/10844106/mitchell-international.

30.    The Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) for several reasons.  First, the 2022 SPD identifies Mitchell as the "Plan Administrator." *See* Mitchell International, Inc. 401(k) Savings Plan Summary Plan Description, January 1, 2022 ("SPD"), at 20 ("The Plan Sponsor and Plan Administrator is Mitchell International, Inc.").

31.    Further, as part of its fiduciary responsibilities, Mitchell designated the Mitchell International, Inc. 401(k) Savings Plan Committee as the investment fiduciary. *See* Mithcell International, Inc. 401(k) Savings Plan Adoption Agreement ("Plan Doc."), at 39 ("The Investment Fiduciary is: the Plan Sponsor, or such person or committee as the Plan Sponsor may designate pursuant to Section 11.02."); *see also* Auditor's Report attached to 2024 Form 5500 for the Plan, at 6 ("The 401(k) Savings Plan Committee is responsible for

7

CLASS ACTION COMPLAINT

oversight of the Plan and determines the appropriateness and monitors performance of the Plan's investment offerings."). Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

32.     Mitchell appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

33.     Accordingly, Mitchell during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

34.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Committee Defendants**

35.     "The 401(k) Savings Plan Committee is responsible for oversight of the Plan and determines the appropriateness and monitors performance of the Plan's investment offerings." Auditor's Report attached to 2024 Form 5500 for the Plan, at 6.

36.     Additionally, the IPS "recapitulates the long-standing practices and approach of the Named Fiduciary and sets forth the manner in which Plan investment options are selected and monitored, consistent with the fiduciary standards of ERISA; including that (1) all transactions undertaken by the Named Fiduciary must be in the sole interest of Plan participants and their beneficiaries to provide benefits and only pay reasonable expenses of Plan administration in a prudent manner."  IPS at 1.

37.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

8
CLASS ACTION COMPLAINT

38.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

## IV.    CLASS ACTION ALLEGATIONS[4]

39.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Mitchell International, Inc. Savings Plan, at any time between November 6, 2019 through the date of judgment (the "Class Period").

40.    The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 lists 6,150 Plan "participants with account balances as of the end of the plan year."  2024 Form 5500 for the Plan, at 2.

41.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

---

[4] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

9

CLASS ACTION COMPLAINT

42. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A.    Whether Defendants are fiduciaries of the Plan;

    B.    Whether Defendants breached their fiduciary duties of prudence by engaging in the conduct described herein;

    C.    Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    D.    The proper form of equitable and injunctive relief; and

    E.    The proper measure of monetary relief.

43. Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

44. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

45. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby

CLASS ACTION COMPLAINT

making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**V.     THE PLAN**

46.     The Plan was established on April 1, 2000 and restated effective January 1, 2022. *See* SPD at 1 ("Mitchell International, Inc. (the "Employer") established the Mitchell International, Inc. 401(k) Savings Plan (the "Plan") effective April 01, 2000.").

47.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

48.     Included in the Plan's available funds was the Guaranteed Income Fund offered by "Empower Annuity Insurance Company of America [formerly known as Prudential Retirement Insurance and Annuity Company]." Auditor's Report, attached to 2024 Form 5500 for the Plan, at 12.

49.     At the end of 2019, $25,448,532 in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2019 Form 5500 for the Plan, at 13.

50.     At the end of 2024, over $90 million in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the Plan, at 14.

51.     The chart below demonstrates the amount of Plan assets invested in the Prudential GIF during the Class Period.

| Plan Year | Plan Assets in Prudential GIF |
| --- | --- |
| 2019 | $25,448,532 |
| 2020 | $88,685,231 |

11

CLASS ACTION COMPLAINT

| 2021 | $103,793,426 |
|------|--------------|
| 2022 | $105,856,608 |
| 2023 | $99,848,765  |
| 2024 | $90,747,272  |

### Eligibility

52.     In general, the Plan covers all employees of Mitchell. *See* SPD, at 2 ("You are an 'Eligible Employee' if you are employed by Mitchell International, Inc. or any affiliate who has adopted the Plan."); see also Auditor's Report attached for 2024 Form 5500 for the Plan, at 7 ("Employees who have reached age 18 are eligible to participate in the Plan immediately after the employee is eligible.").

### Contributions

53.     There are several types of contributions that can be added to a participant's account.

54.     "You may elect to reduce your Compensation (defined below) and make a contribution to the Plan on a pre-tax basis. These pre-tax contributions are known as Elective Deferral Contributions. You may elect to defer up to 100% of your Plan Compensation on a pre-tax basis. You may also elect to make a contribution to the Plan on an after-tax basis. These after-tax contributions are known as Voluntary Contributions." SPD, at 3.

55.     There is an automatic employee contribution feature for the Plan. *See id.* ("After receiving a notice from the Plan Administrator, you will be deemed to have made an Elective Deferral Contribution election in the amount of 3% of your Plan Compensation. The amount of such automatic enrollment will increase by 1% up to a maximum of 12% of your Plan Compensation.")

56.     Mitchell made discretionary decisions regarding matching and other Company contributions to Plan participants. *See* SPD, at 4 (The Employer may, in its sole discretion, make a matching contribution on your behalf if you make a 'Matched Employee Contribution'").

12
CLASS ACTION COMPLAINT

57.     Like other companies that sponsor 401(k) plans for their employees, Mitchell enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally*, https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

58.     Mitchell also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

59.     Given the size of the Plan, Mitchell likely enjoyed significant tax and cost savings from offering a match.

## VI.     THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.     ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

60.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

61.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

62.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest

CLASS ACTION COMPLAINT

of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

63. The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[6]

64. Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

65. A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

66. With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

67. The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

---

[6] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

68.     Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

69.     It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

70.     It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

71.     To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement o, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

72.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

73.     In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs first wrote to the Plan administrator on March 20, 2025 to request, among other

things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

74.    Plaintiffs did not receive a response to their initial request pursuant to Section 104(b)(4) of ERISA. On August 19, 2025, Plaintiffs sent a follow up request to the Plan administrator. As of the date of the filing of this complaint, Plaintiffs have not received a response to the follow-up request, and the Plan administrator has provided no documents pursuant to the Section 104(b)(4) of ERISA request.[7]

75.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence.  Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

76.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon several factors.

77.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Prudential GIF in the

---

[7] Failure to provide Plan documents within thirty days of request is a violation of 29 U.S.C. § 1132(c)(1) and 29 U.S.C. § 1024(b)(4). Plaintiffs reserve the right to amend the instant Complaint to add a count for violation of the forgoing ERISA provisions.

CLASS ACTION COMPLAINT

Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B.    Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Prudential GIF**

78.    A stable value fund "can generally be labeled as a conservative, fixed income investment vehicle with an objective of preserving capital while providing a relatively stable rate of return that generally exceeds the returns provided by money market funds."[8]  In other words, the overarching goal of all stable value funds is to preserve capital.

79.    Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[9]

80.    There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the Prudential GIF; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

81.    "When evaluating a traditional GIC, the most important consideration for the fiduciary-along with the contract terms-is the insurer's financial strength rating since an insurer's general account backs the guarantee that is at the core of this product."[10]

82.    As indicated above, the Plan was invested in a proprietary stable value fund managed by Prudential, then Empower, the Prudential GIF.

83.    There are two significant problems with the Prudential GIF discussed below. First, the Prudential GIF is a traditional GIC and is structured as a general account, fixed

---

[8] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[9] *Id.*

[10] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

annuity contract. As a general account product, the Prudential GIF thus has the following characteristics: single-entity credit risk, plan-level illiquidity, lack of Plan participant ownership and investment control over assets, and lack of transparency as to fees.

84.     The second related problem with the Prudential GIF is that its crediting rates (*i.e.*, rates of return on investment) were/are well below what Defendants could have obtained for the Plan participants on the open market.

85.     Defendants' selection of the imprudent Prudential GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 1.     Prudential/Empower Pose A Severe Risk Of Becoming Insolvent

#### a.     The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable

86.     Because a guaranteed insurance account product - like the Prudential GIF - is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer.  It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

87.     A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable.  It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the

financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See* https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723.

88. The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (1) Higher Risk, Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and Investment Concentrations. See generally, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf)[11]

89. These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets. This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

### b. Based on its Insufficient Surplus, Prudential/Empower Was/Is at Severe Risk of Insolvency

90. Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

---

[11] The letter to The Hon. Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/

91.    An important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better. The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger, aggressive private equity-controlled carriers with much lower ratios. During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio.  For example, as of 2024, Empower's S/L ratio was less than 1%:

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

**LIABILITIES, SURPLUS AND OTHER FUNDS**

| | | 1 Current Year | 2 Prior Year |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. | Common capital stock | 2,500,000 | 2,500,000 |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32. | Surplus notes | 0 | |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. | Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. | Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | shares common (value included in Line 29 $ ) | | |
| 36.2 | shares preferred (value included in Line 30 $ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus: $   1,018,399,778   EAIC's 2024 Surplus to Liabilities
Total Liabilities: $ 106,414,669,390   Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**     **0.96%**          National Average is About **7.5%**.

92.    There are numerous L&A carriers that have substantially higher S/L ratios than Empower.  For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| | | | |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
| 29. | Common capital stock | | |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | |
| 32. | Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. | Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | shares common (value included in Line 29 $ ) | | |
| 36.2 | shares preferred (value included in Line 30 $ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

Total Surplus: $   26,427,441,247   EAIC's 2024 Surplus to Liabilities
Total Liabilities: $ 218,473,153,964   Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**     **12.10%**          National Average is About **7.5%**.

20
CLASS ACTION COMPLAINT

        **c.**      **Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus**

93.    Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) **$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America (Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that $2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.

94.    Separate and in addition to the reserve credit reported above, Empower has also entered into a Modified Coinsurance (ModCo) reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:

21
CLASS ACTION COMPLAINT

95.    The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:



96.    The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer.  There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[12]

97.    Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with

[12]   *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2203 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity"  *See also* "FSOC raises alarm on insurers' use of offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent capital requirements."), available at https://www.insurance businessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insuers-use-of-offshore-reinsurance-527931.aspx.

22
CLASS ACTION COMPLAINT

offshore reinsurance, in addition to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[13] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions. *See* n. 11.

### d.    Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid Investment Concentrations

98.    Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

99.    The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

---

[13] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp.



100. Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

\* \* \*

101. In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

### 2. The Plan's Inclusion of the Prudential GIF

102. At all relevant times, Defendants exercised control over the Plan's investments, including the Plan's Prudential GIF.

103. "The contract issuer is contractually obligated to repay the principal and interest at a specified interest rate that is guaranteed to the Plan." Auditor's Report, attached to the 2024 Form 5500 for the Plan, at 12.

104. Under this term, a prudent fiduciary should be aware of the rates and prevailing marketplace on at least a "semi-annual" basis.

105. The Form 5500 Auditor's Notes state as follows:

24
CLASS ACTION COMPLAINT

The Plan has a fully benefit-responsive guaranteed annuity contract with Empower Trust Company & Empower Annuity Insurance Company of America. Empower Trust Company & Empower Annuity Insurance Company of America maintain the contributions in a general account. The account is credited with earnings on the underlying investment and charged for participant withdrawals and administrative expenses. *The guaranteed investment contract issuer is contractually obligated to repay the principal and specified interest rate that is guaranteed to the Plan*.

*Because the guaranteed annuity contract is fully benefit-responsive*, contract value is the relevant measurement attribute for that portion of the net assets available for benefits attributable to the guaranteed investment contract. Contract value, as reported to the Plan by Empower Trust Company & Empower Annuity Insurance Company of America, represents contributions made under the contract, plus earnings, less participant withdrawals and administrative expenses. Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment at contract value.

There are no reserves against contract value for credit risk of the contract issuer or otherwise. The contract value of the investment contract at December 31, 2024 and 2023 was $90,747,272 and $99,848,765, respectively. The contract issuer is contractually obligated to repay the principal and interest at a specified interest rate that is guaranteed to the Plan. The crediting interest rate is based on a formula established by the contract issuer but may not be less than one-

CLASS ACTION COMPLAINT

and one-half percent. ***The crediting interest rate is reviewed and determined by the contract issuer semi-annually***, effective January 1 and July 1. The contract cannot be terminated before the schedule maturity date.

Certain events limit the ability of the Plan to transact at contract value with the issuer. Such events include: (1) amendments to the plan documents (including complete or partial plan termination or merge with another plan), (2) changes to the Plan's prohibition on competing investment options or deleting of equity wash provisions, (3) bankruptcy of the plan sponsor or other plan sponsor events (for example, divestiture or spinoffs of a subsidiary) that cause a significant withdrawal from the Plan, or (4) the failure of the trust to qualify for exemption from federal income taxes or any required prohibited transaction exemptions under ERISA***. The plan administrator does not believe that any events which would limit the plan's ability to transact at contract value with participants are probable of occurring***.

***The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date***.

106. Benefit responsive means that the participants can initiate transactions, such as withdrawals, at book value without adjustment.

107. For these reasons, the Prudential GIF's crediting rates can be compared to traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-

26
CLASS ACTION COMPLAINT

responsive; (2) whose rates are reviewed regularly; and (3) whose contracts are with creditworthy insurance carriers.

### 3. There are Many GICs in the Marketplace with Competitive Crediting Rates

108. The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

109. Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates were available to the Plans but were not selected by Defendants.

110. These comparisons include:

- The Pomona Valley Hospital Medical Center Retirement Savings Plan's fully benefit-responsive synthetic GIC, where multiple "traditional investment contracts held by the Plan are guaranteed investment contracts" with multiple "contract issuers." *See* Auditor's Report, attached to the 2023 Form 5500 for the Pomona Valley Hospital Medical Center Retirement Savings Plan, at Note E. "The crediting rates are reviewed quarterly" and, like the Prudential GIF, "the contracts cannot be terminated before the scheduled maturity date." *Id*. Also like the Prudential GIF, "[n]o events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id*.

- The Baylor College of Medicine Retirement Plan offered a "fully benefit-responsive investment contract" that is "fully and unconditionally guaranteed by Lincoln National Life Insurance Company." Also like the Prudential GIF, the "The Plan Administrator believes that any events that would limit the Plan's ability to transact at contract value are remote." *See* Auditor's Report, attached to the 2020

CLASS ACTION COMPLAINT

Form 5500 for the Baylor College of Medicine Retirement Plan, at Note 5.

- The Gemba Group Annuity Plan offered a synthetic GIC with multiple underlying "guaranteed investment contracts[,]" and the GIC cannot be cancelled "before the scheduled maturity dates." Auditor's Report, attached to the 2021 Form 5500 for the Gemba Group Annuity Plan, at Note 4; *see also id.*, at Line 4i (listing the insurance companies). Also like the Prudential GIF, "The Plan administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id*. Like the Prudential GIF, "The Plan administrator believes that any events that would limit the Plan's ability to transact at contract value with participants are probable of not occurring." *Id.*, at Note 5.

- The Holzer Health System 401(a) Profit Sharing Plan offered a Common collective trust, with multiple "underlying investments (consisting of guaranteed investment contracts, security-backed contracts and common collective trusts)." Auditor's Report, attached to the 2021 Form 5500 for the Holzer Health System 401(a) Profit Sharing Plan, at Note 3. "[T]he NAV of the fund is determined daily" and the "[u]nits are issued and redeemed" daily. *Id*. Hence, it was fully benefit-responsive. The assets are listed as assets of the plan. *Id.*, at Schedule H.

- The Jackson National Life Insurance Company Defined Contribution Plan offered a fully benefit-responsive investment contract that was a "Company-sponsored" annuity "exclusively designed for use in

CLASS ACTION COMPLAINT

connection with the Plan" and is "backed by the creditworthiness of the Company." *See* Auditor's Report, attached to the 2022 Form 5500 for the Jackson National Life Insurance Company Defined Contribution Plan, at Note 3. The Company (Jackson National Life Insurance Company) is the plan sponsor. Also, the crediting rate is "based on current market rates[,]" not risk. *Id*.

- The Transamerica 401(k) Retirement Savings Plan offered a fully benefit-responsive GIC with Transamerica Financial Life Insurance Company ("TFLIC"), an affiliate of the plan sponsor, Transamerica Corporation. The GIC "consists of stable fund segments" with each segment have "a guaranteed rate of interest" like a Synthetic GIC. Auditor's Report, attached to the 2019 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at page 9. The interest rate is determined quarterly. *Id*., at 10. Like the Prudential GIF, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id*., at 11. "TFLIC is not permitted to pay or transfer the value of the contract, without consent from the Plan, prior to the scheduled maturity date." *Id*.

- The Valley Children's Hospital Defined Contribution Retirement Plan offered "a fully benefit-responsive investment contract with Lincoln National Life Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Valley Children's Hospital Defined Contribution Retirement Plan, at Note 4. "The guarantee is based on Lincoln's ability to meet its financial obligations from the general assets

CLASS ACTION COMPLAINT

of Lincoln." *Id.* "The Plan administrator does not believe that any events that would limit the Plan's ability to transact at contract value with participants are probable of occurring." *Id.*

- The HCC Insurance Holdings Inc. 401(k) Plan offered a fully benefit responsive guaranteed investment contract where the "interest rates are reviewed on a quarterly basis for resetting" and, like the Prudential GIF, "The Plan administrator does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable." Auditor's Report, attached to the 2019 Form 5500 for the HCC Insurance Holdings Inc. 401(k) Plan, at Note 4. The assets of the HCC insurance GIC are Plan assets, albeit held by MassMutual. *Id.*, at Schedule H.

- The American United Life Progress Sharing Plan and Trust offered a "fully benefit-responsive fixed interest investment option with the Company" that "is maintained in the Company's general account" where the rates are "determined quarterly." Auditor's Report, attached to the 2020 Form 5500 for the American United Life Progress Sharing Plan and Trust, at Note 2. The insurance carrier is/was also the plan sponsor. Also, like the Prudential GIF, "[t]he Plan Administrator does not believe the occurrence of any such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id.*

- The Auto-Owners Insurance Company Retirement Savings Plan offered a "a fully benefit-responsive investment contract with Auto-Owners Life Insurance Company (AOLIC), a wholly owned subsidiary of Auto-

30
CLASS ACTION COMPLAINT

Owners Insurance Company." Auditor's Report, attached to the 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at Note 3. Like the Prudential GIF, "The plan administrator does not believe" that any events that "would limit the Plan's ability to transact at contract value" "is probable", and "The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id.*

- The International Imaging Materials Inc. Retirement and Investment Plan offered a "traditional fully benefit-responsive investment contract[]" carried by Lincoln National Life Insurance Co. Auditor's Report, attached to the 2022 Form 5500 for the International Imaging Materials Inc. Retirement and Investment Plan, at Note 2. The crediting rates are determined "quarterly" and, like the Prudential GIF, "there are no events that limit the ability of the Plan to transact at contract value with the issuers." *Id.* Although "Lincoln Insurance maintain[s] the contributions in a general account fund" it is listed as plan assets. *Id.*, at Note 2 and Schedule H. Rates are based on "factors, including economic and market conditions, the general interest rate environment and the expected and actual return on the portfolio within the general account[,]" not risk. *Id.*

- The Mattel, Inc. Personal Investment Plan offered a fully benefit-responsive "traditional GIC" where "the contract itself is owned by the Plan." Auditor's Report, attached to the 2023 Form 5500 for the Mattel, Inc. Personal Investment Plan, at Note 3. "The Plan's administrator does not believe that the occurrence of any such event, which would limit the

Plan's ability to transact at contract value with participants, is probable" and "Mattel is unaware of any events which occurred during 2023 that would allow contract issuers to terminate the contracts held by the Plan." *Id.*

- The Trugreen Profit Sharing and Retirement Plan offered a "a traditional fully benefit-responsive guaranteed investment contract." Auditor's Report, attached to the 2021 Form 5500 for the Trugreen Profit Sharing and Retirement Plan, at Note 4. "The crediting rate is reviewed on a quarterly or semiannual basis for resetting. The guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*. "No events are probable of occurring that might limit the ability of the Plan to transact at contract value." *Id*. Although "MassMutual maintains the contributions in a general account[,]" *id*., the assets are listed as plan assets. *Id*., at Note 4, Schedule H.

111. The Prudential GIF in the Plan had underwhelming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans (like the ones mentioned above):

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[14] |
|---|---|---|---|---|---|
| 2019 | Baylor College of Medicine Retirement Plan | 12,587 | $1,278,730,175 | Lincoln National Life Insurance Co. | 4.29% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 5,002 | $1,090,110,381 | Jackson National Life Insurance | 4.28% |

[14] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

32
CLASS ACTION COMPLAINT

| | | | | | |
|---|---|---|---|---|---|
| | Holzer Health System 401(a) Profit Sharing Plan | 1,896 | $179,609,420 | American United Life Insurance Company | 3.98% |
| | Transamerica 401(k) Retirement Savings Plan | 15,140 | $2,020,965,905 | Transamerica Financial Life Insurance Company | 3.85% |
| | American United Life Progress Sharing Plan and Trust | 3,051 | $377,919,056 | American United Life Insurance Company | 3.70% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,515 | $355,957,124 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | **Mitchell Plan** | **1,945** | **$176,039,307** | **Prudential GIF** | **2.25%** |
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln National Life Insurance Co. | 4.16% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Mitchell Plan** | **5,423** | **$535,909,982** | **Prudential GIF** | **2.02%** |
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln National Life Insurance Co. | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |

33
CLASS ACTION COMPLAINT

| | | | | | |
|---|---|---|---|---|---|
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Mitchell Plan** | **6,012** | **$614,883,004** | **Prudential GIF** | **1.70%** |
| | | | | | |
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln National Life Insurance Co. | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **Mitchell Plan** | **6,658** | **$551,134,973** | **Prudential GIF** | **1.68%** |
| | | | | | |
| 2023 | The Valley Children's Hospital Defined Contribution Retirement Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |

CLASS ACTION COMPLAINT

| | | | | |
|---|---|---|---|---|
| Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| **Mitchell Plan** | **6,703** | **$623,406,129** | **Prudential GIF** | **1.92%** |

112. Throughout the Class Period, the Prudential GIF in the Plan underperformed the comparator funds by at least 51%, as demonstrated in the table below.

| Year | Prudential GIF Rate of Return in the Plan | Comparator Average Rate of Return | Prudential GIF Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2019 | 2.25% | 3.94% | 42.89% |
| 2020 | 2.02% | 3.75% | 46.13% |
| 2021 | 1.70% | 4.19% | 59.43% |
| 2022 | 1.68% | 4.13% | 59.32% |
| 2023 | 1.92% | 3.85% | 50.13% |
| Average Underperformance during Class Period | | | 51.58% |

113. Notably, in 2021 the Prudential GIF's crediting rate decreased while the Comparator GIC's crediting rates *increased*, indicating Defendants' failure to adequately investigate the prevailing marketplace and achieve similar adjustments in the same economy. Subsequent increases were still insufficient to bring the crediting rates in line with the prevailing marketplace and meaningful returns.

114. The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Prudential GIF's dismal crediting rate.

115. Again, specific Comparator GICs used herein all had similar risk considerations based on their terms, the creditworthiness of their insurance carriers, and the fact that their plan administrators did not believe it probable that any plan or sponsor event would limit the ability of the Plan to transact at contract value. The Comparator GICs were all fully benefit-responsive and their crediting rates were all regularly reviewed in the same prevailing marketplace and economic circumstances as the Prudential GIF.

116. The Prudential GIF should be achieving at least the same performance of traditional guaranteed investment contracts.

117. In short, because the Plan held between $176 million and $658 million in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates under the same or better circumstances.

118. A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates from the Insurance Companies and/or by submitting requests for proposals to Insurance Companies and other providers of stable value investments.

119. By selecting the Prudential GIF with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

120. With the massive amount of assets under management in the Prudential GIF, the losses suffered by Plan participants were devastating. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[15]

---

[15] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

CLASS ACTION COMPLAINT

## COUNT I

## Breaches of Fiduciary Duty of Prudence

## (against the Committee)

121. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

122. At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

123. As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

124. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

125. As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Prudential GIF, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

126. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

127. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT II

### Failure to Adequately Monitor Other Fiduciaries

### (against the Company)

128. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

129. Mitchell (the "Monitoring Defendant") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and was aware that the Committee had critical responsibilities as fiduciaries of the Plan.

130. In light of this authority, the Monitoring Defendant had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

131. The Monitoring Defendant also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

132. The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a

CLASS ACTION COMPLAINT

system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

133. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

134. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

CLASS ACTION COMPLAINT

E.      An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: November 6, 2025          Respectfully submitted,

**THE DLJ LAW FIRM, P.C.**

*/s/ Dorian L. Jackson*
Dorian L. Jackson (Bar No. 269795)
3655 Torrance Boulevard, Suite 300
Torrance, CA  90503
Telephone: (310) 359-9203

Facsimile: (310) 359-9202
E-Mail: djackson@dljlawfirm.com

**CAPOZZI ADLER, P.C.**
Mark K. Gyandoh, Esquire
(*Pro Hac Vice* to be requested**)**
PA Attorney ID # 88587
James A. Maro, Esquire
(*Pro Hac Vice* to be requested**)**
PA Attorney ID #86420
312 Old Lancaster Road
Merion Station, PA 19066
Telephone:  (610) 890-0200
Fax:  (717) 233-4103
Email:  markg@capozziadler.com
            jamesm@capozziadler.com

*Counsel for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT